UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA
CASE NO. 24-CR-20343-KMW

UNITED STATES OF AMERICA,

     Plaintiff,

vs.

ROGER ALEJANDRO PIÑATE MARTINEZ,

     Defendant.

_____/

**DEFENDANT ROGER PIÑATE'S MOTION TO**
**DISMISS COUNTS 4-6 FOR FAILURE TO STATE AN OFFENSE**

Defendant Roger Piñate respectfully moves to dismiss Counts 4-6 of the Indictment for failure to state an offense pursuant to Fed. R. Crim. P. 12(b)(3)(B)(v). These counts charge international laundering of monetary instruments in violation of 18 U.S.C. § 1956(a)(2)(A). But that statute proscribes certain transfers of "funds [either (1)] from a place in the United States to or through a place outside the United States or [(2)] to a place in the United States from or through a place outside the United States," and the Indictment does not allege either kind of transfer. The Indictment alleges wire transfers from a place outside the United States to another place outside the United States, which are neither "from" nor "to a place in the United States." The plain text of the statute thus does not reach these alleged transfers, and the Indictment therefore fails to state an offense.

The Indictment alleges that these wire transfers were routed "through an intermediary bank account" in the United States, but that allegation does not bring these foreign wire transfers within the statute's textual scope. The statute reaches *domestic* transfers that travel "through a place *outside* the United States," but the express inclusion of that phrase—twice—makes clear that the statute does not reach *foreign* transfers that travel through a place *inside* the United States. A

1

straightforward reading of the statutory language compels that conclusion; the statute's history reinforces the same result; and the rule of lenity requires resolving any doubts in Mr. Piñate's favor. Mr. Piñate accordingly respectfully moves to dismiss Counts 4-6 for failure to state an offense.

## **RELEVANT BACKGROUND**

This motion raises a straightforward issue of statutory construction, a pure question of law. Counts 4-6 of the Indictment charge Mr. Piñate and his co-defendants with violations of 18 U.S.C. § 1956(a)(2)(A), *i.e.*, international promotional money laundering.  The text of that statute provides:

> (2) Whoever transports, transmits, or transfers, or attempts to transport, transmit, or transfer a monetary instrument or funds from a place in the United States to or through a place outside the United States or to a place in the United States from or through a place outside the United States—
>
> > (A) with the intent to promote the carrying on of specified unlawful activity …
>
> …
>
> shall be sentenced to a fine of not more than $500,000 or twice the value of the monetary instrument or funds involved in the transportation, transmission, or transfer, whichever is greater, or imprisonment for not more than twenty years, or both.

18 U.S.C. § 1956(a)(2).  These three charges are based on three alleged "[w]ire transfer[s]" in August 2016, each "in the amount of approximately $500,000 from [one of two] Hong Kong Bank Account[s], through an intermediary bank account in New York, to Baumann Bank Account 2411 in Singapore."  Indictment at 22 ¶ 2.  These allegations of brief incidental transfers through a correspondent bank in New York are the Indictment's only allegations that these transfers had any contact with the United States, in contrast to cases involving allegations of extensive and deliberate money laundering within the country. *Cf., e.g.*, *United States v. Polit*, 2023 WL 6949835, at *1-2 (S.D. Fla. Aug. 17, 2023) (describing indictment's allegations that the defendant and a co-

2

conspirator "unlawfully enriched themselves by laundering bribes that [they] solicited and received … through bank accounts located in the Southern District of Florida" and "through Florida corporations, purchasing businesses and real estate," all "[b]etween 2010 and 2014"), *R. & R. adopted*, 2023 WL 6846742 (S.D. Fla. Oct. 17, 2023) (Williams, J.).

## LEGAL STANDARD

A "defendant may challenge an indictment on a variety of … grounds, including failure to state an offense." *United States v. Kaley*, 677 F.3d 1316, 1325 (11th Cir. 2012) (citing Fed. R. Crim. P. 12(b)(3)(B)). An indictment that "does not state an offense under the [relevant] statute … is deficient" "as a matter of law" and must be dismissed. *United States v. Bobo*, 344 F.3d 1076, 1086 (11th Cir. 2003). An indictment fails to state an offense "if the defendants' charged conduct, even if true, does not violate the statute or provision cited in the indictment." *United States v. Berdeal*, 595 F. Supp. 2d 1326, 1328 (S.D. Fla. 2009).

## ARGUMENT

The plain text of the statute forecloses the government's theory of money laundering. The statute expressly reaches transfers that either originate or terminate in the United States (or both) and travel "through a place outside the United States." The statute does not include any corresponding language covering transfers from one foreign country to another that travel through a place *inside* the United States—which is all the Indictment alleges here. A natural reading of the relevant text resolves this case.

All other interpretive guides point toward the same reading. Legislative history confirms that Congress drafted the specific statute at issue here to fight money laundering by *domestic* criminals and *domestic* money, not to give the government a license to prosecute conduct occurring on the other side of the world with no connection to the United States beyond an incidental transfer

3

through a domestic branch of a financial institution.  Even if there were an interpretive tie, the rule of lenity would require the Court to resolve it against the government's attempt to extend criminal statutes beyond the conduct their text plainly reaches.  The proper interpretation of the statute is an open question in this (and nearly every[1]) Circuit, and the statutory text supplies a clear answer. This Court should apply the plain text of the statute, reinforced by all other relevant indicia of legislative meaning, and dismiss Counts 4-6.

## A.   The plain text of the statute does not reach transfers that are neither initially "from" nor ultimately "to" the United States.

The Eleventh Circuit has been clear: "Statutory interpretation starts, and ideally ends, with the text." *Fuerst v. Hous. Auth. of City of Atl.*, 38 F.4th 860, 869 (11th Cir. 2025); *see also, e.g.*, *Van Buren v. United States*, 593 U.S. 374, 381 (2021) ("[W]e start where we always do: with the text of the statute.").  When statutory text resolves an interpretive question, "the judicial inquiry is complete." *Babb v. Wilkie*, 589 U.S. 399, 413 (2020) (quotation marks omitted); *accord, e.g.*, *Kroner v. Comm'r*, 48 F.4th 1272, 1276 (11th Cir. 2022)  Our constitutional system requires the supremacy of statutory text, because "only the words on the page constitute the law adopted by Congress and approved by the President." *Bostock v. Clayton County*, 590 U.S. 644, 654 (2020). "The people are entitled to rely on the law as written, without fearing that courts might disregard its plain terms based on some extratextual consideration." *Id.* at 674.  For these reasons, "no

---

[1] To the defense's knowledge, the only Circuit to address the interpretive question presented here is the Second Circuit, which adopted the government's broader reading of § 1956(a)(2) in *United States v. Ho*, 984 F.3d 191 (2d Cir. 2020).  The Eleventh Circuit has made clear, however, that when statutory text answers an interpretive question, that ends the inquiry—regardless of any nonbinding case law reaching different results.  *See, e.g.*, *United States v. Pate*, 84 F.4th 1196, 1199-1210 (11th Cir. 2023) (en banc) (construing statute based on "statutory text, context, and structure," *id.* at 1203, and rejecting "the government's insist[ence] that existing caselaw support[ed] its [contrary] interpretation," *id.* at 1205); *Johnson v. White*, 989 F.3d 913, 916-18 (11th Cir. 2021) (finding answer in statutory text alone, and rejecting contrary "out-of-circuit cases on which [the defendant] relie[d]" as "unavailing," *id.* at 918 n.4).

amount of policy-talk can overcome a plain statutory command"; the judicial role "is to give the law's terms their ordinary meaning and, in that small way, ensure the federal government does not exceed its statutory license." *Niz-Chavez v. Garland*, 593 U.S. 155, 171 (2021); *see also, e.g.*, *In re Guillen*, 972 F.3d 1221, 1228 (11th Cir. 2020) ("[P]olicy concerns cannot overcome the plain language of the statute."). The statutory text here is conclusive, as it often is.

The international money laundering statute covers transfers of "funds" that travel either "[(1)] from a place in the United States to or through a place outside the United States or [(2)] to a place in the United States from or through a place outside the United States." 18 U.S.C. § 1956(a)(2). Phrase (1) reaches any transfer that begins in the United States ("from a place in the United States") and crosses the border, regardless of whether the transfer ultimately ends abroad ("to … a place outside the United States") or back in the United States ("through a place outside the United States"). Phrase (2) conversely reaches any transfer that ends in the United States ("to a place in the United States") after having previously crossed the border, regardless of whether that transfer initially began abroad or began somewhere in the United States and went through another country before returning. The two phrases together reach any transfer that either starts or ends in the United States and at some point crosses the border.

A transfer from one place outside the United States to another, such as a transfer from Hong Kong to Singapore, does not fit either option—even if the transfer passes through the United States on the way from its foreign origin to its foreign destination. The cardinal rule of federal statutory construction is that "Congress says what it means and means what it says." *Simmons v. Himmelreich*, 578 U.S. 621, 627 (2016). Congress's inclusion of the phrase "through a place outside the United States" means that the international money laundering statute reaches initially and ultimately domestic transfers that pass through another country. Had Congress intended for

the statute to reach initially and ultimately *foreign* transfers that pass through the United States, Congress could and would have said so by including the phrase "through a place in the United States."

Congress's omission of that phrase means that the statute does not cover a transfer that neither starts nor begins in the United States but merely passes through the country. "'*Expressio unius est exclusion alterius*'"—"the mention of some implies the exclusion of others not mentioned." *United Dominion Indus., Inc. v. United States*, 532 U.S. 822, 836 (2001) (quoting *Letherman v. Tarrant Cnty. Narcotics Intel. & Coordination Unit*, 507 U.S. 163, 168 (1993)); *see also Johnson v. White*, 989 F.3d 913, 918 (11th Cir. 2021) (discussing and applying this canon). The explicit inclusion of the phrase "through a place outside the United States" implies that the statute excludes transfers through a place in the United States. Courts "ordinarily resist reading words or elements into a statute that do not appear on its face." *Bates v. United States*, 522 U.S. 23, 29 (1997). Given the "clear language" reflecting Congress's intent to reach domestic transfers that temporarily go abroad, "it would be improper to conclude that what Congress omitted from the statute"—foreign transfers that temporarily pass through the United States—"is nevertheless within its scope." *Univ. of Tex. Sw. Med. Ctr. v. Nassar*, 570 U.S. 338, 353 (2013); *accord Johnson*, 989 F.3d at 918 ("We may not import into the statute a provision Congress elected not to include." (brackets omitted) (quoting *United States v. Hurtado*, 779 F.2d 1467, 1475 (11th Cir. 1985))).

This understanding not only reflects the plain meaning of the statutory text but also comports with other guiding principles of statutory interpretation. A court applying a statute "must … interpret the statute 'as a symmetrical and coherent regulatory scheme,' and 'fit, if possible, all parts into a harmonious whole.'" *FDA v. Brown & Williamson Tobacco Corp.*, 529 U.S. 120, 133 (2000) (internal citations omitted) (first quoting *Gustafson v. Alloyd Co.*, 513 U.S.

561, 569 (1995); and then quoting *FTC v. Mandel Bros., Inc.*, 359 U.S. 385, 389 (1959)); *see also Nassar*, 570 U.S. at 353 ("Just as Congress' choice of words is presumed to be deliberate, so too are its structural choices.").  Reading Phrase (1) to reach cross-border transfers that start in the United States and Phrase (2) to reach cross-border transfers that end in the United States produces such a coherent, symmetrical reading of the full provision.  Not so for an interpretation of the statute that would depart from its plain meaning to reach foreign transfers that pass through the United States.

The government's apparent interpretation also runs afoul of another "cardinal principle of statutory construction": that a court "must 'give effect, if possible, to every clause and word of a statute.'"  *Williams v. Taylor*, 529 U.S. 362, 404 (2000) (quoting *United States v. Menasche*, 348 U.S. 528, 538-39 (1955)); *accord, e.g.*, *United States v. Hastie*, 854 F.3d 1298, 1304 (11th Cir. 2017).  Reading the statute to reach transfers that pass through the United States without stopping or ending here would render some statutory language a nullity.  If either or both of the phrases "from a place in the United States" and "to a place in the United States" captured transfers through a place in the United States, then either or both of the phrases "to … a place outside the United States" and "from … a place outside the United States" would have to capture transfers through a place outside the United States as well.  That would render the express phrase "through a place outside the United States" superfluous, violating the principle that disfavors a statutory "reading which renders some words altogether redundant."  *Gustafson*, 513 U.S. at 574.  That the statute includes two separate uses of the phrase "through a place outside the United States" makes the government's reading doubly wrong.

All of these textualist principles converge to support the same reading of the statute as reaching only cross-border transfers that either start or end in the United States.  Most importantly,

that is the plain meaning of the statutory text.  The canon of *expressio unius*, the statutory structure, and the rule against superfluities all reinforce that the natural reading of the statute is the correct one.  The interpretive "inquiry ceases" when, as here, "'the statutory language is unambiguous and the statutory scheme is coherent and consistent.'"  *Barnhart v. Sigmon Coal Co.*, 534 U.S. 438, 450 (2002) (quoting *Robinson v. Shell Oil Co.*, 519 U.S. 337, 340 (1997)); *accord Kroner v. Comm'r*, 48 F.4th 1272, 1276 (11th Cir. 2022).  Because Mr. Piñate's textualist reading of the statute is unambiguously correct, the Court need not even reach other interpretive tools—but, as it turns out and as detailed below, they all point to the same conclusion.

**B.    Legislative history reinforces that Congress did not draft the money laundering statute to reach initially and ultimately foreign transfers.**

The history of the money laundering statute confirms that Congress drafted it with *domestic* crime in mind; Congress certainly was not thinking about alleged schemes based entirely in Asia that happened to graze a U.S. financial institution.  The relevant language first appeared in the Bank Secrecy Act, Pub. L. No. 91-508, 84 Stat. 1114 (1970)[2] (codified as amended in scattered sections of 12 U.S.C., 18 U.S.C., and 31 U.S.C.), in a provision requiring "reports of exports and imports of monetary instruments."[3]  The Bank Secrecy Act represented the government's "first attack on money laundering," taking the "indirect" approach of imposing "reporting requirements" on certain transactions to facilitate "'criminal, tax, or regulatory investigations.'"  Sarah N. Welling, *Smurfs, Money Laundering, and the Federal Criminal Law: The Crime of Structuring*

---

[2] For ease of reference, all cited legislative history materials are attached in an appendix to this motion.

[3] The specific statutory language when enacted required reports on qualifying "transports" of "monetary instruments" either "from any place within the United States to or through any place outside the United States" or "to any place within the United States from or through any place outside the United States."  84 Stat. at 1122; *see also* 31 U.S.C. § 5316(a) (current version, as revised, recodified, and reenacted without relevant substantive change by Pub. L. No. 97-258, 96 Stat. 877, 998 (1982)).

*Transactions*, 41 Fla. L. Rev. 287, 292-93 (1989) (quoting 31 U.S.C. § 5311 (1982)).  That Act's legislative history reflects that Congress sought "to aid law enforcement authorities to prosecute U.S. criminals" but "not to limit or impede the free flow of currency in international commerce" and thus chose "to require reports on currency exports and imports," without imposing barriers to them.  S. Rep. No. 91-1139, at 7 (1970); *see also* H.R. Rep. No. 91-975, at 13 (1970) (explaining that the Act would "close a serious investigative loophole" to strike at "American criminal elements" that "ha[d] been taking or sending currency out of the United States either in furtherance of a criminal activity or in a secret foreign haven").  Both the Senate and House described the language relevant here as intended to create a paper trail for currency transfers "into or out of"— not through—"the country."  S. Rep. No. 91-1139, at 15; *accord* H.R. Rep. No. 91-975, at 22 ("into or out of the United States").

The Bank Secrecy Act failed to prevent money laundering as Congress intended.  *See United States v. Bucey*, 876 F.2d 1297, 1306 n.17 (7th Cir. 1989); *see also* Welling, *supra*, 41 Fla. L. Rev. at 295-99.  In 1983, President Reagan created the Commission on Organized Crime to study the issue, and the Commission soon reported that the Bank Secrecy Act's penalties were "far too lenient to punish and deter money laundering."  President's Comm'n on Organized Crime, Interim Report to President & Att'y Gen., *The Cash Connection: Organized Crime, Financial Institutions, and Money Laundering* viii (Oct. 1984).  The Commission's analysis of international money laundering framed the problem as primarily concerning domestic criminal (mostly drug) activity generating proceeds transferred abroad, with significant amounts of that money flowing back into the United States after being laundered.  *See id.* at 13-17; *see also id.* at 56 (recommending administrative measures "to deter money launderers in the United States from using foreign countries so freely for money laundering").  The Commission did not describe any

significant converse problem of foreign criminals laundering money in the United States.  The Commission concluded its report by strongly recommending that the government "strike directly at the heart of the problem by making the use of financial institutions by money launderers a criminal offense" under federal law.  *Id.* at 62.  The draft legislation that the Commission proposed included a predecessor to what is now 18 U.S.C. § 1956 that included a single money laundering offense with no distinction between domestic and international money laundering.  *Id.* at 67.

After the Commission published its report, Congress considered numerous draft bills to address money laundering, none of which included the specifically international offense at issue here.  *See* H.R. Rep. No. 99-855, at 8-10 (1986) (discussing history of House bills); S. Rep. No. 99-433, at 4-9 (1986) (discussing history of Senate bills).  The relevant language—apparently borrowed from the Bank Secrecy Act's reporting requirement—first appeared in separate House and Senate compromise money laundering bills, before it was ultimately codified as part of the broader Anti-Drug Abuse Act of 1986, Pub. L. No. 99-570, 100 Stat. 3207, 3207-18.[4]  The Senate report explains that "[t]he concept for inclusion of this section" proscribing international money laundering was "derived from" a provision in an earlier bill, proposed by the Reagan Administration, "making illegal the receipt of the proceeds of foreign drug offenses."  S. Rep. No. 99-433, at 11; *see* S. 1335, 99th Cong. § 8(a) (1985) (proposed new offense imposing liability on anyone who "brings or transfers into the United States any money or property which has been obtained in connection with" a foreign drug offense).  The same report explains that § 1956(a)(2) "covers situations in which money is being laundered by transferring it into the United States as

---

[4] "Congress did not submit any reports with the Anti-Drug Abuse Act of 1986, which contained the Money Laundering Control Act of 1986," but courts have looked to the two "related reports" cited in body text for their "insight into the purpose behind the money laundering statute." *United States v. Stavroulakis*, 952 F.2d 686, 691 (2d Cir. 1992); *see also, e.g.*, *United States v. LeBlanc*, 24 F.3d 340 (1st Cir. 1994).

well as those in which money is being laundered by transferring it out of the United States," and that it would "prevent the United States from becoming a haven in which foreign drug traffickers can keep or invest their earnings." S. Rep. No. 99-433, at 11. The House report similarly describes the international money laundering offense as prohibiting covered transfers "into or out of the United States," adding that the offense "augment[ed] the existing" Bank Secrecy Act to address "the most common way in which money laundering is initiated": "the physical transportation of cash out of the country." H.R. Rep. No. 99-855, at 15.

All of this legislative history—the history of the Bank Secrecy Act, the government's first effort to combat money laundering and the original source of the "from," "to," or "through" language; the Commission on Organized Crime's report on the shortcomings of that Act and recommendations for improvement; and the legislative history of the Money Laundering Control Act itself—supports Mr. Piñate's reading of the statute, not the government's. Every relevant source treats *domestic* crime as the offense's primary target and describes the operative language as targeting transfers "into or out of," not through, the United States. The House recognized the problem of domestic criminals laundering money by transferring it out of the United States, which also raises the possibility of laundered money then being funneled back into the country, as the Commission observed. The Senate also described § 1956(a)(2) as ensuring that foreign criminals would not move money into the country to launder and keep it here. But there is simply no evidence throughout this legislative history that Congress enacted § 1956(a)(2) to address any real or perceived problem of foreign criminals funneling money into the United States to launder it and take it back abroad—much less any evidence that Congress meant to sweep up foreign transfers that incidentally happen to touch a U.S. correspondent bank, which is all that the Indictment alleges here. The legislative history thus reinforces that the natural reading of § 1956(a)(2) is the best one:

the statute applies to transfers from the United States to other countries, from other countries to the United States, and from the United States "through a place outside the United States" and back. The statute's text does not discuss transfers through a place *inside* the United States because Congress did not intend for the statute to reach such transfers.

**C.    The rule of lenity requires resolving any interpretive doubts in favor of the defense.**

"The rule of lenity is one of the oldest and most traditional tools of statutory interpretation." *Romero v. Sec'y, Dep't of Homeland Sec.*, 20 F.4th 1374, 1383 (11th Cir. 2021).  The Supreme Court has held for centuries that "ambiguity concerning the ambit of criminal statutes should be resolved in favor of lenity"—*i.e.*, that interpretive ties go to the defendant.  *Rewis v. United States*, 401 U.S. 808, 812 (1971); *see, e.g.*, *United States v. Lacher*, 134 U.S. 624, 628 (1890) ("[T]here can be no constructive offenses; and, before a man can be punished, his case must be plainly and unmistakably within the statute."); *United States v. Wiltberger*, 18 U.S. (5 Wheat.) 76, 105 (1820) (Marshall, C.J.) ("[P]robability is not a guide which a court, in construing a penal statute, can safely take."); *United States v. Pate*, 84 F.4th 1196, 1208 (11th Cir. 2023) (en banc).

Significantly, the Supreme Court has reaffirmed the rule of lenity when interpreting the very statute at issue here.  *See United States v. Santos*, 553 U.S. 507 (2008).  Although no single opinion won the support of a majority of the Court, the rule of lenity did.  The Court found it ambiguous whether "the term 'proceeds' in the federal money-laundering statute means 'receipts' or 'profits,'" deeming both interpretations plausible.  *Id.* at 509 (plurality op.) (internal citation omitted).  Justice Scalia, writing for four Justices, reasoned that "the 'profits' definition of 'proceeds' is always more defendant-friendly than the 'receipts,' definition," so "the rule of lenity dictate[d] that it should be adopted."  *Id.* at 514.  Justice Stevens concurred in the judgment, diverging from some of the plurality's reasoning but finding its "opinion … surely persuasive" in

concluding that "the rule of lenity may weigh in the determination" of how to interpret the statute. *Id.* at 528 (Stevens, J., concurring in the judgment).

This Court should heed the Supreme Court's judgment in construing a different provision of the same statute. As Justice Scalia explained, the "venerable" rule of lenity

> not only vindicates the fundamental principle that no citizen should be held accountable for a violation of the statute whose commands are uncertain, or subjected to punishment that is not clearly prescribed. It also places the weight of inertia upon the party that can best induce Congress to speak more clearly and keep courts from making criminal law in Congress's stead.

*Id.* at 514 (plurality op.); *see also Romero*, 20 F.4th at 1383 ("The rule of lenity's dual purposes are (1) to provide defendants with fair warning that their actions may trigger criminal consequences, and (2) to ensure that the legislature (and not the judiciary) remains responsible for criminalizing conduct."). Lenity ensures that courts "interpreting a criminal statute … do not play the part of a mindreader." *Santos*, 553 U.S. at 515. All available indicia of congressional intent here confirm that Mr. Piñate's interpretation of § 1956(a)(2) is the correct one—and at the very least preclude the conclusion that the statute unambiguously bears the broader meaning the government asserts. Should the Court have any doubt about the proper interpretation of the statute, lenity requires resolving that doubt in Mr. Piñate's favor. *See Romero*, 20 F.4th at 1384 (holding that where a statute is reasonably susceptible of two interpretations, "the rule of lenity requires that we accept the … interpretation [that] criminalizes a narrower range of conduct").

## CONCLUSION

The plain text of the statute resolves this case and requires dismissal of Counts 4-6. Applicable interpretive canons and legislative history weigh in favor of the same conclusion. For the foregoing reasons, Mr. Piñate respectfully requests that the Court dismiss Counts 4-6 of the Indictment for failure to state an offense.

Respectfully submitted,

COLSON HICKS EIDSON, P.A.
255 Alhambra Circle, Penthouse
Coral Gables, Florida 33134
Tel: (305) 476-7400

By:   /s/ *Curtis B. Miner*
   Curtis B. Miner, Esq.
   (Florida Bar No. 885681)
   E-mail: curt@colson.com
   Thomas A. Kroeger, Esq.
   (Florida Bar No. 19303)
   E-mail: tom@colson.com


*and*

MORGAN, LEWIS & BOCKIUS, LLP
1111 Pennsylvania Avenue NW
Washington, DC 20004-2541
Tel: 202-739-5932
Sandra L. Moser, Esq. (*pro hac vice*)
E-mail: Sandra.moser@morganlewis.com
Justin D. Weitz, Esq. (*pro hac vice*)
E-mail: Justin.weitz@morganlewis.com
Andrew R. Hellman, Esq. (*pro hac vice forthcoming*)
E-mail: Andrew.hellman@morganlewis.com

*Counsel for Defendant Roger Alejandro Piñate Martinez*

14

## <u>CERTIFICATE OF CONFERRAL</u>

Pursuant to Local Rule 88.9(a), counsel have conferred with the government by telephone in a good faith effort to resolve the issues raised in the motion and have been advised by the government that it will oppose the motion.

## <u>CERTIFICATE OF SERVICE</u>

I HEREBY CERTIFY that a true and correct copy of the foregoing, including attachments, was filed conventionally with the Clerk of the Court on this 28th day of April, 2025, and that service will made on counsel of record pursuant to Local Rule 5.4(b)(1).

By: ___/s/ *Curtis B. Miner*_____
Curtis B. Miner, Esq.